Considered by MORRIS, MURDOCK, and SIEFKIN.

----

ZENITH MILLING CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 5454. Promulgated November 7, 1927.

1. Value of buildings and machinery on March 1, 1913, determined.
2. Paid-in surplus at the time of incorporation in 1907 determined.
3. The profits of the petitioner credited to the accounts of the stockholders in proportion to their holdings without the formal declaration of dividends *held* not to constitute part of petitioner's surplus for invested capital purposes.

*Perry W. Schrader, Esq.,* for the petitioner.
*C. H. Curl, Esq.,* for the respondent.

This is a proceeding for the redetermination of a deficiency of $4,448.13 income and profits tax for the year 1919. The deficiency results from the respondent's refusal to accept as correct the amount of invested capital reported by the petitioner and in determining the March 1, 1913, values of certain assets for depreciation purposes at smaller amounts than the values at which they were included in the returns filed.

The petitioner is a Missouri corporation with its principal office at Kansas City.

In 1880 the Zenith Milling Co. was incorporated under the laws of Missouri with a capital stock of $50,000, and took over the milling business, theretofore conducted by L. M. Miller, C. A. Young and L. S. Mohr, as a partnership. Miller and Mohr were brothers-in-law and Mohr and Young were cousins. The company took over the real estate and machinery previously belonging to the partnership, set these up on its books at a value of $50,000, and issued therefor all of its capital stock to the partners.

The original mill, which had a capacity of 150 barrels a day, was enlarged from time to time until in 1907 it had a daily capacity of 1,000 barrels.

On June 19, 1905, the charter expired. However, the business was carried on and continued in the same manner as had been done previous to the expiration of the charter. Miller on November 10, 1906, assigned and delivered to his wife Mabel A. Miller, the certificate for his 167 shares of stock in the company. About the first of 1907 and shortly before the death of Miller, trouble arose between Mohr and Mabel A. Miller in regard to her withdrawal of certain amounts of money from the business. It was then discovered by counsel for Mohr and Young that the company's charter had previously expired.

The company was reincorporated under the same name on February 8, 1907, with a capital stock of $50,000 divided into 500 shares of a par value of $100 each. The incorporators and the number of shares subscribed for by each were:

|                | Shares |
| -------------- | ------ |
| L. S. Mohr     | 249    |
| C. A. Young    | 250    |
| Paul M. Mohr   | 1      |

There was no reorganization of the business, which continued as before. No change was made in the books and all that was done was to obtain a new charter. Balance sheets were not prepared at this time.

The board of directors on March 1, 1907, adopted the following resolution:

Upon motion of Charles A. Young, seconded by Paul M. Mohr, the following resolution was unanimously adopted: "Resolved that the company purchase all the property and assets of the Zenith Milling Company, a corporation whose charter expired on the 19th day of June, 1905, from the surviving trustees of said corporation, the consideration of said purchase to be, with the consent of the stockholders of this corporation, and the Directors present at this meeting, being all the stockholders, that there shall be issued to each holder of stock of said defunct corporation, the same number of shares of the same par value in

this company, and that this company shall further assume, and it does hereby assume all the liabilities of whatsoever character of said defunct Zenith Milling Company, and that the President and Secretary of this company be and they are hereby ordered to deliver to the surviving trustees of said defunct company the following certificates of stock in this company—One in the name of Mabel A. Miller of One Hundred and Sixty-seven (167) shares, one in the name of Charles A. Young of One Hundred and Sixty-seven (167) shares, one in the name of Lewis S. Mohr of One Hundred and Sixty-five (165) shares, and one in the name of Paul M. Mohr of One (1) share, for the use and benefit of the persons named respectively.

Mabel A. Miller declined to accept the 167 shares of stock for which a certificate had been issued in accordance with the foregoing resolution, and threatened legal action against the corporation. Negotiations were entered into for the purchase of her interest in the property and on September 12, 1907, the following resolutions were adopted at a meeting of the board of directors:

Whereas, Louis M. Miller on the 10th day of November 1906 assigned in writing and delivered to Mabel A. Miller a certificate for One Hundred and Sixty-seven Shares of the Zenith Milling Company organized June 19, 1880 and

Whereas the period of existence of said Zenith Milling Company expired June 19, 1905 and the transfer of stock made Mabel A. Miller the owner of an undivided interest in both the real and personal property of said Zenith Milling Company in proportion to the shares of stock owned by her and

Whereas the Zenith Milling Company a corporation organized July 8, 1907 desires to purchase her interest in said property and she is willing to accept the sum of Fifty Thousand Dollars therefor, on motion of C. A. Young seconded by Paul M. Mohr, the President of this Company is directed to purchase the interest of said Mabel A. Miller, at and for the sum of Fifty Thousand Dollars and to pay for the same as follows:

Twenty-five Thousand Dollars in a certified check of this Company payable to the order of Mabel A. Miller at the First National Bank of Kansas City, and to execute on behalf of this Company its two promissory notes, one for the sum of Ten Thousand Dollars and payable on or before six months from date with interest at the rate of six per cent per annum, and one note for the sum of Fifteen Thousand Dollars payable on or before twelve months after date with interest at six per cent per annum, payable semi-annually, both of said notes shall be payable to Mabel A. Miller at the office of Barber & Barber in Kansas City, Missouri, and said cash is paid and notes executed and delivered to said Mabel A. Miller for the purpose of paying said Mabel A. Miller for her interest in as well as for her stock in the Zenith Milling Company a corporation organized June 19, 1880 and whose assets and property of every kind and description were sold and transferred by said Lewis S. Mohr and Charles A. Young as trustees to this Company of date March 1st, 1907.

Mabel A. Miller having this day sold to this Company her interest in the Zenith Milling Company, a corporation organized June 19, 1880, and the corporate existence of which expired June 19, 1905, and whose assets have been purchased by this Company, and to whom Certificate No. 3 for 167 shares of this Company was issued for the purpose of paying for her interest in said Zenith Milling Company organized June 19, 1880, having declined to accept the same, it is now ordered that Certificate No. 3 for 167 shares of the capital stock of this Company standing in the name of said Mabel A. Miller and

having been issued for said purpose but not delivered to said Mabel A. Miller, be and the same is now cancelled and for naught held.

Lewis S. Mohr and Charles A. Young being now desirous of purchasing the stock heretofore issued to said Mabel A. Miller, it is now ordered that said 167 shares of said capital stock be sold to said Lewis S. Mohr and Charles A. Young, and that they pay to this Company the value thereof, and that said sum of money be placed to the credit of the capital stock of this Company on its books, so that the entire capital stock of this Company as it appears from this date is as follows:

Lewis S. Mohr 249 shares, Charles A. Young 250 shares and Paul M. Mohr 1 share, and all of which said capital stock is now fully paid up.

Pursuant to the above resolution, Mabel A. Miller was given a check for $25,000 and two notes of the company, one for $15,000 and the other for $10,000, both of which were subsequently paid. Of the total of $50,000 represented by the check and notes, $25,000 was in payment of the credit to which she was entitled, and the remaining $25,000 was for her stock. On September 14, 1907, L. S. Mohr and C. A. Young entered into the following agreement:

WHEREAS, Lewis S. Mohr, and Charles A. Young are the equal owners of the entire capital stock of the Zenith Milling Company, a corporation; and

WHEREAS, Lewis S. Mohr desires that Paul M. Mohr shall purchase seventy (70) shares of said stock:

Now, It is agreed between said Lewis S. Mohr and Charles A. Young, that said Paul M. Mohr may purchase seventy (70) shares of said stock at and for the sum of One Hundred and Fifty ($150) Dollars per share, and for the payment thereof he shall execute and deliver to said Lewis S. Mohr and Charles A. Young his promissory note of even date herewith for the sum of Ten Thousand Five Hundred ($10,500) Dollars, due one day after date with interest thereon at the rate of six per cent per annum until paid, at which time we agree to issue or cause to be issued to said Paul M. Mohr certificate for seventy (70) shares; and

WHEREAS, Charles A. Young desires that Nathan Young, when he reaches his majority, shall purchase seventy (70) shares of said stock:

Now, It is agreed between said Lewis S. Mohr and Charles A. Young that upon the happening of said event, they will sell to said Nathan Young seventy (70) shares of said capital stock at the same price and upon the same terms as they have this day sold said seventy (70) shares to said Paul M. Mohr, but if said Nathan Young should not upon attaining his majority purchase said stock, then said Charles A. Young shall not be called upon to furnish any stock to said Paul M. Mohr, but said Charles A. Young shall repay to said Paul M. Mohr any sum or sums of money together with the interest thereon that he may have received from said Paul M. Mohr by reason of his purchase of said stock, it being the understanding and purpose of this agreement that said Lewis S. Mohr, together with Paul M. Mohr and Charles A. Young together with Nathan Young shall be the owners of two hundred and fifty (250) shares each in said corporation, and both said Lewis S. Mohr and Charles A. Young at any meeting of the shareholders shall be entitled to vote two hundred and fifty shares each.

No dividend earned on said stock shall be paid at any dividend-paying time to any shareholder in said corporation until said Lewis S. Mohr and Charles A. Young shall each have received a credit of Fifteen Hundred ($1500) Dollars per annum each, the same being for interest on said working capital that said

Lewis S. Mohr and Charles A. Young have respectfully furnished to said corporation.

It is further agreed between said Lewis S. Mohr and said Charles A. Young that in case of the death of either, the survivor thereof shall have the privilege of purchasing the stock of the deceased within one year thereafter at the price of Two Hundred ($200) Dollars per share, and that the running capital now to the credit of said Lewis S. Mohr and Charles A. Young or what may be to the credit of each at that time, cannot be withdrawn from said corporation within one year thereafter. All of the capital stock of said corporation, together with the note of Paul M. Mohr is now deposited with E. F. Swinney, President of the First National Bank of Kansas City, Missouri, to be by him held and shall not be delivered or withdrawn by any person or persons except upon the written consent of both of said parties hereto.

It is further agreed that said Paul M. Mohr shall be entitled to all dividends on the stock this day by him purchased and that may be hereafter declared, but for the six months ending December 31, 1907 he shall only recover his proportionate share of said earnings from the date hereof. And the dividend arising upon the remaining Four Hundred and Thirty Shares of said capital stock, until said Nathan Young shall have purchased the seventy shares aforementioned, shall be equally divided between said Lewis S. Mohr and Charles A. Young.

Paul M. Mohr purchased 70 shares of the company's stock and gave therefor one note to L. S. Mohr for 35 shares at $150 per share and another note to C. A. Young for an equal number of shares at the same price. The notes were payable out of the earnings of the company or from any other money he might obtain from outside sources.

At no time was a dividend ever declared nor did the company have a surplus account on its books, but twice each year profits were determined and the amount thereof credited to the individual accounts of the stockholders in proportion to their holdings. Whenever the company purchased machinery or other fixed assets the amount of such purchases was charged against the accounts of the stockholders in proportion to their holdings. During 1898 and 1899 the company remodeled its mill and installed new machinery and equipment at a total cost of $29,715.68 and in 1902 added a new boiler plant at a cost of $9,108.53. These amounts were charged to the accounts of the stockholders in proportion to their holdings of stock. Some time after incorporation in 1880 the stockholders L. M. Miller, C. A. Young, and L. S. Mohr agreed among themselves that each would keep to his account a minimum credit of $25,000 for the company's use as an operating fund, and prior to Miller's death the credit was never reduced much below that amount. The credit of $1,500 to be made to the accounts of C. A. Young and L. S. Mohr as provided for in the agreement between them dated September 14, 1907, was interest on the amounts kept by them as credits to their accounts.

The minutes of the meeting of the board of directors on April 6, 1908, contain the following:

Minutes of previous meeting read and approved, there being no further business the meeting adjourned, after instructing the secretary to spread upon the minutes the following: " Because of differences in the matter of the holdings of the widow of Lewis M. Miller, our former President, it seems best that there should be a statement spread upon the minutes of the company, regarding the running capital of the company which is clearly understood by us to wit: ' That the amounts standing to the credit of L. S. Mohr and C. A. Young, constitutes our running capital and in no manner removable, without the joint consent of both parties, and that the interest credited before profits are divided is in no sense interest for borrowed money, but for the purpose of equalizing our respective interests in the capital referred to.' "

The corporation's books show that on February 28, 1907, and on December 31, 1918, the stockholders' accounts had credit balances as follows:

|  | Feb. 28, 1907 | Dec. 31, 1918 |
|---|---|---|
| L. M. Miller | $25,800.32 | |
| L. S. Mohr | 28,716.59 | $133,968.96 |
| C. A. Young | 30,475.56 | 60,918.59 |
| Total | 84,992.47 | 194,887.55 |

The petitioner's machinery and equipment, including power plant and foundations, on March 1, 1913, had a value of $81,000. Its buildings, which consisted of a " main " building, an office building, engine room, boiler room, warehouse, and crib elevator had a value of $30,000 on March 1, 1913.

The following is from petitioner's balance sheet as at December 31, 1918:

|  | Per books December 31, 1918 | Adjusted December 31, 1918 | Difference |
|---|---|---|---|
| ASSETS | | | |
| Current assets: | | | |
| Cash on hand | $47,189.24 | $47,189.24 | |
| Accounts receivable | 43,415.68 | 43,415.68 | |
| Bills receivable | 46,193.80 | 46,193.80 | |
| Merchandise inventory | 44,112.49 | 44,112.49 | |
| Fixed assets: | | | |
| Real estate | 4,514.32 | 4,514.32 | |
| Add value in excess of amount paid in for stock | | 20,485.68 | |
|  | | 25,000.00 | $20,485.68 |
| Mill Building | 15,000.00 | 15,000.00 | |
| Add value in excess of amount paid in for stock | | 17,809.62 | |
|  | | 32,809.62 | 17,809.62 |
| Mill machinery | 30,485.68 | 30,485.68 | |
| Add value in excess of amount paid in for stock | | 46,626.71 | |
|  | | 77,112.39 | 46,626.71 |

| | Per books December 31, 1918 | Adjusted December 31, 1918 | Difference |
|---|---|---|---|
| ASSETS—continued | | | |
| Fixed assets—Continued. | | | |
| Elevator building—value in excess of amount paid in for stock | | $10,474.83 | $10,474.83 |
| Office building—value in excess of amount paid in for stock | | 1,124.27 | 1,124.27 |
| Engine and boilers—value in excess of amount paid in for stock | | 40,609.00 | 40,609.00 |
| Office furniture and fixtures—value in excess of amount paid in for stock | | 983.99 | 983.99 |
| | $230,911.21 | 369,025.31 | 138,114.10 |
| LIABILITIES | | | |
| Accounts payable | 3,974.00 | 3,974.00 | |
| Due to stockholders | 167,456.30 | 167,456.30 | |
| Reserve for depreciation | | 34,824.11 | 34,824.11 |
| Capital stock—common | 50,000.00 | 50,000.00 | |
| Value of tangible property in excess of stock issued therefor | | 138,114.10 | 138,114.10 |
| Undivided profits | 9,480.91 | −25,343.20 | −34,824.11 |
| | 230,911.21 | 369,025.31 | 138,114.10 |

OPINION.

TRAMMELL: The petitioner contends that the respondent has erred with respect to the following: (1) Failure to find that certain buildings, machinery, and equipment owned by the petitioner and used in its business in 1919 had on March 1, 1913, a value in excess of the cost as carried on petitioner's books and to use such value as a basis in determining the deductions allowable for depreciation. (2) Failure to allow a paid-in surplus for the value of tangible property, including stockholders accounts paid in to the corporation at the date of incorporation, February 8, 1907, in excess of the par value of the stock issued therefor. (3) Failure to determine invested capital and to use such invested capital as a basis for computing petitioner's profits tax. (4) Failure to include in invested capital as surplus as, at December 31, 1918, the stockholders' accounts on the books of the petitioner.

The respondent denies the commission of any error in the determination of the proposed deficiency.

With respect to the petitioner's contention that a greater value as at March 1, 1913, than shown by its books as cost should have been allowed in computing the deduction for depreciation on its buildings, machinery and equipment, we are unable to determine from the record what amount was shown by the books and used by the respondent as the value at March 1, 1913, of these properties. The petitioner urges that on March 1, 1913, its buildings had a value of $30,000 and in support thereof introduced testimony of two witnesses. One of the witnesses, L. S. Mohr, testified to a total value of the buildings of $30,000. He stated that the values used by him were based on the construction prices on March 1, 1913, considering the condition of the buildings. The other witness testified to a reproduction cost of the buildings in 1913 of $35,660. He testified that the fair market value

of the buildings on March 1, 1913, was $32,100. In determining this value, he began with the reproduction cost, considered the state of the buildings and their suitability for the work of the company, taking into account how much less the buildings might be worth than new buildings of the same character. This witness was both an architect and builder, and had had some experience in valuing property that was being bought and sold.

We have heretofore held that the replacement cost of buildings alone gives no dependable index to their actual value, but in this case the witnesses testified that the reproduction cost was merely considered by them in determining the March 1, 1913, value.

They were competent to express an opinion as to that value, and in the absence of other evidence we must give it due weight and consideration. The preponderance of the evidence is that the buildings were worth $30,000 on March 1, 1913, and we so hold.

In support of its contention that the allowance for depreciation on machinery and equipment had been computed on an improper value as on March 1, 1913, the petitioner submitted the testimony of a milling engineer who in 1913 was a salesman of the particular kind of machinery owned by the petitioner and was employed by the same company which sold the machinery to petitioner. He testified to a value on March 1, 1913, of $81,000. This value was ascertained by reducing the replacement cost on March 1, 1913, of $91,000 by $10,000, representing depreciation. He further testified that he saw this machinery in operation several times during 1913, had observed its condition, and was familiar with the prices at which such machinery was then being sold. We think that his testimony, which was not contradicted, is sufficient to warrant us in holding that the value on March 1, 1913, was $81,000.

The petitioner's second assignment of error is that the respondent failed to allow a paid-in surplus for the value of tangible property including stockholders' accounts claimed to have been paid in to the corporation at the date of incorporation in February, 1907, in excess of the par value of the stock issued therefor.

In connection with this contention, the petitioner urges that not only did the physical assets paid into the corporation have a value in excess of the $50,000 par value of its capital stock, but that in addition to the physical assets paid in there were also paid in by the stockholders their credit balances totaling $84,992.47.

The evidence does not show of what " all the property and assets " referred to in the resolution of the board of directors on March 1, 1907, and taken over by the petitioner consisted. Nor does it show the extent or amount of the " liabilities " referred to in the resolution and assumed by the petitioner. The evidence does not show that any list or any appraisal was made of the assets at the time they

were taken over, but does show that balance sheets were not prepared at that time.

While we do not know the value in 1880 of the real estate and machinery taken over by a predecessor corporation of the petitioner for $50,000 of capital stock, we have found that during 1898 and 1899 the mill was remodeled and new machinery and equipment was installed at a total cost of $29,715.98, that in 1902 a new boiler plant was added at a cost of $9,108.53, and that the foregoing amounts were charged to the accounts of the stockholders in proportion to their stockholdings. There is also uncontroverted evidence that the mill which in 1880 had a capacity of 150 barrels a day had been enlarged from time to time so that in 1907 it had a daily capacity of 1,000 barrels. In 1880 the assets were carried on the books at $50,000. We have also found that the petitioner paid Mabel A. Miller $25,000 for the 167 shares of its stock issued to her for her one third interest in the assets taken over by the petitioner, which did not include the amounts credited to her account.

It also appears that Paul M. Mohr, the son of L. S. Mohr, in September, 1907, purchased 70 shares of the stock of the petitioner at $150 per share; that in the same month L. S. Mohr and C. A. Young entered into an agreement whereby it was provided that in the event of the death of either the survivor should have the privilege of purchasing the stock of the deceased within one year at $200 per share.

All of these facts taken and considered together convince us that the actual cash value of the tangible assets was at least $25,000 in excess of the par value of the stock issued therefor in 1907.

In further support of the contentions for a paid-in surplus, the petitioner urges that at the time of incorporation in 1907 the stockholders contributed to the corporation as paid-in surplus the credit balances of their accounts totaling $84,992.47.

In regard to this, the evidence indicates that Mabel A. Miller was not agreeable to the plan of turning in to the company after its incorporation in 1907 her interest in the predecessor business and that during the year she was paid the amount of the credit to which she was entitled. We also find that on September 14, 1907, L. S. Mohr and C. A. Young entered into an agreement which provided that before any stockholder should receive any of the earnings of the corporation Mohr and Young should receive a credit of $1,500 per annum, the same being for interest on working capital that they had furnished to the corporation. In addition to the $1,500 credited to Mohr's account, the evidence shows that other amounts were credited as interest to his account, as the credit balance of his account was in excess of that of Young. The amounts credited to the share-

holders' accounts represented earnings of the corporation which were taken from the corporate assets. They then became separated from corporate assets and became the property of the stockholders. It was available to them. This is not a case of mere bookkeeping entries, but the actual earnings were available for distribution and were credited to each stockholder as his separate property. In order to be included in the corporate assets, therefore, such earnings so distributed must be turned back to the corporation.

From all the evidence, we are unable to find that the stockholders' credits were paid in to the corporation so as to constitute paid-in surplus within the meaning of the Act.

The petitioner's remaining contentions are that the respondent erred in failing to determine its invested capital, to include in its invested capital as surplus at December 31, 1918, the credit balance of the stockholders' accounts and to use such invested capital as the basis for computing petitioner's profits tax.

We have found that on December 31, 1918, the credit balances of the stockholders' accounts totaled $194,887.55, which amount the petitioner insists should be included in its invested capital as surplus since no distributions have ever been made by the corporation to the stockholders by the declaration of dividends.

We have heretofore held that the crediting of a corporation's profits to the stockholders' accounts in proportion to their holdings without the formal declaration of a dividend represents a distribution. *Appeals of Electrical Supply Co.*, 1 B. T. A. 658; *Kelly-Buckley Co.*, 1 B. T. A. 1154; and *Lobsitz Hardware Co.* v. *Commissioner*, 5 B. T. A. 295. In the instant case, we are of the opinion that the semiannual crediting of petitioner's profits to the accounts of its stockholders constituted such a distribution thereof as to prevent their being a part of the corporation's surplus and as such a part of its invested capital. In the light of the facts in this case, we are of the opinion that the credit balances of the stockholders belonged to them and not to the corporation. When used by the corporation they constituted borrowed capital and therefore under the Act may not be included in invested capital. To the extent that the stockholders contributed any amounts from their credit balances to the corporation in payment for assets bought by the corporation they constituted paid-in surplus.

We are of the opinion that the petitioner's invested capital for 1919 should include at least the amount of $75,000 which represents the actual cash value of assets paid in in 1907.

*Judgment will be entered on 15 days' notice, under Rule 50.*

Considered by MORRIS, MURDOCK, and SIEFKIN.